Our final case for argument today is P and P Imports v. Johnson Enterprises. Good morning, Your Honor. James Doroshow appearing on behalf of Johnson Enterprises. At least for me, I'm having trouble hearing you, so you may have to speak louder or bring the mic closer to you. Can you hear me better now, Your Honor? Yes, a little bit better. Mr. Yohalem, whenever you're ready. Just one moment, please, Your Honor. Good morning, Your Honors, and may it please the Court. Mark Yohalem on behalf of P and P. The District Court committed a clear legal error on the core issue of what a plaintiff must prove in order to establish secondary meaning. The District Court granted summary judgment for the, quote, fundamental reason that a plaintiff must, quote, meet its burden to show that the trade dress has become associated with the plaintiff itself. That's the Court's emphasis. That is contrary to the text of the Lanham Act and to this Court's controlling precedent in cases like Maljot. And Johnson does not defend the standard applied by the District Court. That error, which Johnson does not address until page 48 of its brief, alone requires reversal. Instead of defending the decision below, Johnson makes what Clicks Billiards held were jury arguments. In that seminal decision in Clicks, this Court reversed summary judgment based on just two art attack factors, intentional copying and survey evidence. Both were hotly disputed by the defendant, who made almost all of the same arguments my opponent does here. This Court held that challenges to the survey methodology and innocent explanations for copying were matters for the jury, not things for the District Court to consider at summary judgment. The evidence here is actually much stronger than in Clicks. For one thing, the pool halls there were actually different in many ways. Here, it's undisputed that Johnson's product is virtually identical to ours. For another, the defendant in Clicks disputed copying Clicks Billiards' trade dress, whereas here, Johnson admitted that they identified our game as the best seller and, quote, ordered samples and sent those samples to our supplier in China to duplicate because, quote, we believed we could willfully produce it ourselves without any legal consequences. First. On that point, to establish secondary meaning, is it enough to present evidence of intentional copying? Is that one factor enough, or do we need more factors? This Court has held, for example, in Clicks itself and in Fuddruckers, that in the right circumstance, intentional copying alone is sufficient, and the right circumstances are explained in this Court's decision in audio fidelity, and that is when there is identical copying versus mere similarity because what audio fidelity says is there is no logical reason for the precise copying, save an attempt to realize upon a secondary meaning that is in existence. Now, Johnson's response to that and to Clicks Billiards actually just amounts to two sentences in their brief, even though Clicks Billiards is, A, a seminal case cited over 100 times by this Court alone, and, B, on all fours. They say Clicks Billiards is irrelevant, their word, because they say it's applying a different standard for intentional copying than what applies in a products case. That's just wrong. The pin site they provide for that proposition is just the first page of the Clicks decision, which makes no mention of copying at all. And when Clicks does get to copying, the cases Clicks cites are product design cases. So those are transgrow, audio fidelity, and others. And Clicks itself is often cited in product design cases. So the idea that Clicks can be distinguished on that basis is untrue. I agree with you, at least for me, that the evidence of intentional copying here is pretty egregious. On the other hand, it seems like everyone is just merely copying Hasbro's Connect Four. So is this a circumstance where I would say just the evidence of intentional copying alone is enough to find secondary meaning, or at least there's a disputed issue of the fact on that? So first of all, yes, we do think it's alone. I just want to just flag we think we have strong evidence on all the heart attack factors. But let me answer your specific question about Connect Four. So the answer is no, not everyone is copying Connect Four. My friend on the other side points out Connect Four has been around for over 40 years. The undisputed evidence in the record is that during those 40 years, no one dressed a four-in-a-row game the way we did. Then we did it. We became the leader in this niche market. And 10 months later, they copied our design identically. There are significant differences between our design and Connect Four. The trade dress, the function of the game is the same. But Connect Four has a different color scheme. It has a different shape to the board. It doesn't have legs. It has feet that sit flush to the ground. The chips are different. They have those raised teeth around the edge, and they're stamped with a four. So there are considerable differences. And what our expert says is that companies that want to sell in this market dress their toys and games differently to create a product recognition. That's what we did. As our expert explained, we found a striking new way of dressing this game. That's not what my friends on the other side did. What they did was they said, they were asked, how did you develop this product? And the answer was, we found the best-selling product and sent it to China. They did nothing to develop their own trade dress. And what our expert explained is that that is evidence not just of copying the trade dress and the goodwill that goes along with it. And there's considerable additional evidence that supports that. Number one, and I want to correct the record on this, my friend on the other side says they always sold their game and marketed it with the logo visible. That's not true. So Exhibit B, to our complaint, is a screenshot of their website selling the game without the logo. This came up, it was fully ventilated at summary judgment, and they ultimately conceded that they had marketed the game without the logo on their website. Now, what's striking is that if, in fact, as they say, the game was always manufactured with the logo, that means they created marketing material in which they removed the logo to make it even more indistinguishable from our game. They also staged it the same way. You notice if you look at the different games when they're sold online, every other company, they have a slightly different angle, they have different things around it, maybe they have people playing it, the chips are placed differently. They didn't just copy our design, they copied the way we staged the photo, they copied the flavor language we used to describe the product, and they made additional steps to further copy the dress, not the functional elements itself. Finally, as our expert explained, there was another instance in which they copied a different P&P design. In that case, they copied a stylized P that was on a cornhole game. The P is obviously P&P's symbol, and that they copied that there is further indicative of a desire to copy trade dress and not merely the functional elements. Now, they have arguments, they can make a jury argument that this is all about Connect Four. But that is not a summary judgment argument. At summary judgment, as this court held in Clix, Vision Sports, Fudruckers, and Adidas, there is at least a permissible inference of secondary meaning that comes from the intentional copying. The second thing is that we don't just rely on intentional copying. We have survey evidence of 63% of consumers saying that they identified this product with a single source. But looking at that survey, I mean, I guess, you know, another way to look at that is, you know, when someone shows a picture of your product, I think most people will think of, again, I think, Connect Four. And when the question is asked, is it from a single company, a single source, I think people will say yes because they think of Connect Four. I understand there are differences, but I think for most people, they may have played Connect Four 20, 30, 40 years ago. They have some vague recollection, and that's their response. I don't know if that survey really proves the point that your expert is claiming to do so. Well, that, again, is a jury argument. There's no competing expert offering that opinion. And to confirm, there's no Daubert motion or anything of the sort? There is no Daubert motion. After summary judgment was submitted, that is after the hearing date when the judge said there was no hearing, they later filed a trial motion in limine, but they didn't challenge his expertise to conduct this kind of survey evidence. They had this legally incorrect argument that you can't take a litigation survey to show past consumer perception. That argument is foreclosed, but that was the extent to which they challenged his expertise was saying he had done a methodologically wrong approach. The other thing is the surveys in Clicks Billiards were way worse. So, Clicks Billiards, if you go on West Hall, you can get the briefs that the parties submitted and actually get PDFs of them. The way those surveys were conducted is Clicks had someone in the billiard hall itself ask customers who were consuming the products in Clicks to say, do you think that this decor only pertains to Clicks? That was the extent of the survey, and what the district judge there said was that this survey is worthless. And what this court said is, no, a judge can't do that. If the survey is admissible, and obviously our survey methodology was better than the methodology in Clicks, then it goes to the jury to decide whether there are questions that go to weight on methodology, on credibility, and things like that. The thing I will say is that this is a really good expert. I mean, this is not the sort of hack runner that doesn't know anything about the field. This is someone with 35 years professional experience building brands, including for the toy industry, including, in fact, for Hasbro, which made Connect Four. And all of his opinions, he explained how he was drawing on that experience and that expertise in issuing these opinions as to each of the art attack factors. There's no expert on the other side. Normally, I will say, the way you see cases go is  And even then, it's very hard to get summary judgment. Here, we had the only expert, and it was unrebutted. And this court held in Playboy that that alone probably precludes summary judgment. Didn't... Doesn't the other side argue that the survey was done two years later? Yes, they make that argument, and that argument has been repeatedly rejected by this court. It was explicitly rejected in Fabergé. And the surveys and clicks were done in the context of litigation. And what the Third Circuit explained in the case that we cite in our brief is that if that rule were correct, you would basically never have survey evidence because most companies are not constantly conducting market recognition surveys like that. The way the surveys are almost always done is in litigation, and so they'll always be after the fact. The only case my friend cites that supposedly supports this theory is the Federal Circuit case. That is an idiosyncratic case standard not applied elsewhere. But even that one says if the surveys are within five years, they come in. These surveys were within two years. So there's no way you can kick the surveys on that. If there were, it would have applied in clicks as well. I'd like to quickly just walk through some of the other art attack factors because there are a few things in my opponent's briefing that aren't right, and I just want to make sure I've clarified those. So first, as to sales figures, they repeatedly quote a number that is one-fifth the actual number. The actual number was in the exhibits they submitted at summary judgment. And the number that they argued at this court on appeal is far lower. It's about a fourth of the number that they argued in their summary judgment papers. The second thing I will note is that they say we showed no evidence of advertising prior to Johnson entering the market. That's not true. Our experts specifically said the advertising was very front-loaded and was so successful on the front end that as a consequence we actually dialed back our advertising because we were running out of inventory. Third, they say that we introduced no evidence of advertising featuring the trade dress. That's at page 39 of their brief. In fact, Mr. Wallace explained that the trade dress, quote, is the main focal point of the entire advertisement. That's at ER 187. And that the advertising campaign was designed to, quote, get the image of our product in front of as many eyes as possible that are in the target market at 185. Finally, as to the duration of exclusive use, my friend argues that we can't show exclusivity because once Johnson started infringing, we no longer had exclusivity. That's not the test. The duration of exclusive use, as they actually point out, is how long we were using it before Johnson entered the market because that's the question of whether we've established trade dress. There's no question that we had exclusivity for that period, but only imitators came afterwards. And there's no evidence that any of those imitators had sufficient market presence for it actually to significantly impair our exclusive use even after Johnson's entrance. So for all those reasons, we just think that, number one, Clicks Billiards controls, and, number two, even if Clicks Billiards wasn't out there, we clearly have evidence on all the art attack factors. The district court itself found we had evidence on multiple art attack factors, and that precludes summary judgment. Thank you. Thank you. Mr. Dershow, whenever you're ready. You're on mute. Thank you. I think you're still on mute. Can you hear me now, gentlemen? Okay. Well, let's take a look at this case. There are three elements, as you know, for trade dress in terms of non-functionality. In the case of an unregistered mark and one that is not distinctive, they have to show secondary meaning and all the factors associated with it, and, thirdly, they have to show their confusion. This case fails on all three grounds, as we briefed, and I will shortly explain again. We asked the 36 witnesses to show up to testify on the issue of functionality. Their own witness testified that all of the elements, it's part of their game, the board, the legs, the chips, everything else were all functional. There was no testimony until their expert showed up, who's not a faculty witness, and frankly and honestly, as they admit, he's a brand expert. He is not somebody who's competent to testify. If I could interrupt you, the district court didn't rule on functionality or likelihood of confusion, right? Well, the district court did make a reference leaving aside the issue of functionality, and as the court knows, if there's evidence in the record, you can make a decision, even though the court didn't explicitly use it. Isn't it better for us, you know, for the court to, for us to remand on the district court? I mean, we don't have the full record here. It wasn't, obviously it wasn't decided by the district court, so in putting it to the record, not all the evidence is there, so it doesn't seem like we should rule on issues, very fact-intensive issues that weren't decided by the district court. Okay. Well, again, I will stop on the issue of functionality at this point with that in mind, Your Honor, but there is, there is admissions in the record by their own witness, and their expert was not qualified to opine on the issue of functionality. As you know, the issue is one of whether or not they met the burden of proof under cellotapes, right? So, what we're dealing with here is a summary judgment motion that is based on the lack of evidence. The question is, did they or could they meet their burden of proof on the issue of functionality? By their own admission, there is no evidence in this record to show that any of the elements, except the color that they, for the first time, introduced 10 months before suing us, which is not sufficient to show that it's not functional. It's merely an indication for refinement. Okay. Let's get to the issue of secondary meaning. As I said, this is not a distinctive mark. It is not a registered mark. The issue of, let's go to the issue of the survey that was done here. And again, the experts opining on issues, you'll note that they did not submit a declaration from anybody other than an expert. And as I showed in our brief, this expert started talking about conversations that he had with the owners of the company. Even though I deposed the company owners, none of this is found in his testimony. This is something that they're trying to offer for the first time after the close of discovery, where I never had an opportunity to question the fact witnesses, and they've never offered a declaration from the owner or anyone else, including to show what advertising was done, when it was done, how much was expended. In fact, on the issue of advertising, all they said is, take a look at our, they never quantified even the amount of money that was spent. They gave a discount to Amazon to show it, but without even showing that it was advertising. What we're left with is them showing their product on an Orange County beach, supposedly to show that there was sufficient or significant advertising done. There are numerous cases that hold $5 to $10 million in advertising expenditures are insufficient. In this case, we don't even know what the amount was expended on advertising. You'll note that while counsel briefly referred to it in his oral argument this morning, there is no discussion in the briefs that he submitted on any of the other factors that are necessary to support a showing of secondary meaning. Let's take a look at the period of use here. We had 10 months, and this is in the district court's judge's order. They had 10 months to supposedly develop secondary meaning. As the courts have held, secondary meaning does not arise at the time that a product is introduced into the marketplace. They have to show that it's been developed over time. One of the justices just asked, what is it that could be shown within 10 months? They did not, through their survey evidence, try to show that the secondary meaning existed, which all courts in this country have uniformly agreed must be shown before first use by the junior party. The expert admitted that his survey was intended to design perception at the time the surveys were conducted, two and a half years after they were taken. If this court were to rule that that is sufficient to show secondary meaning at the time of the infringement, which the Ninth Circuit in the Carter decision and other courts, as shown in the citations in McCarthy, have ordered, you no longer have a requirement that you show secondary meaning at the time of the infringement. You're allowing a party who admittedly has not shown in a survey that there has been any perception at the time of the infringement, 10 months after a product was sold in the market. But as – no, go ahead. No, go ahead. Well, counsel, you know, at least from my point of view, what you have to address is the effect of the cases that your opponent relies on, a whole line of Ninth Circuit cases, Click, Billiards, and Fuddruckers, I guess, and others, that, you know, proof of intentional copying alone in some circumstances can be sufficient to establish secondary meaning. Now, you disagree with that case law, or if not, tell me why that case law doesn't govern this case. I don't dispute it, but as you know, until – the first question is whether a protectable right exists. The court needs to ask the question whether or not – people copy each other's products all the time in a competitive market. As one of the justices just noted, Mattel has been selling this product for 40 or 50 years, and you'll see when you look at the surveys, in fact, that it shows that most people thought that this product emanated from the Connect Four game that was in the market well before. But you can't say that copying supports a finding of secondary meaning unless you find that the other factors that were met to show that a protectable right existed. Otherwise, the party is free to do whatever it chooses to do. The other thing I'd point out is… and voila, you look at it, and they look very, very similar. So, I mean, this is not just trying to get the look and feel a little bit. I mean, they literally got your competitor's product, and you sent it to a manufacturer in China, and they produced a strikingly similar one. I mean, that does seem pretty egregious evidence of intentional copying. Well, Your Honor, first of all, they identified one witness who said they would testify about the issue of copying, and that was the manufacturer. They never deposed the manufacturer. They have never offered an affidavit or a declaration from them. There is no evidence in this record, apart from the appearance of the products, which, again, parties use similar designs all the time. You look at the automobile industry, people are allowed to take a design, particularly a design… apart from the color, are well-known elements that have been used with a Connect4 game for years, and color itself does not support a finding of copying. The other thing is there has to be an intent to deliberately mislead. You have no evidence that that was the case here. My client was free to use, and people were using these colors independent of what you find in this lawsuit. So the mere fact that the same colors were used with a product that's been in the market for 40 or 50 years, and the fact that you have no evidence from a fact witness, the manufacturer was never deposed. They never even bothered to ask them, and that's the only person they ever identified in their initial disclosures and in their auditory responses that would supposedly support the claim that there was intentional copying. There is no evidence of that. Now, the mere appearance alone, unless there's a protectable right or a showing that there was deliberate copying in this case, does not defeat a motion for summary judgment. If it did, this court would effectively be ruling that copying will always arise, or assumption of copying will always arise, when there's no witness to support it. Well, didn't they show deliberate intention by the evidence that they had of seeking out this exact style, these exact colors? Wasn't, I believe it was Johnson's testimony, exactly that? It was, but again, until there's a protectable right, this happens all the time. Trade dress doesn't emerge within a 10-month period of time with a limited number of sales, with virtually no advertising, simply because somebody uses a design where there's no trade dress protection associated with it. Particularly within this short period of time, they could have called a witness. The mere appearance alone will not support a finding of intentional copying. People do that all the time in the marketplace, and they're wise to do it. Popularity alone is also not a sufficient factor to find secondary meaning exists. But we're at the summary judgment stage. Maybe you'll prevail on the merits of trial, but here, hasn't PNP produced enough evidence at least to preclude summary judgment? I don't believe so, Your Honor, and I don't believe the district court did it either. Whether this court will ultimately agree with that or not is another issue. But with a record that is devoid of any fact witness supporting what their position was at the district court level, and again, under Celotex, it's their burden of proof to show something, not submit a fact declaration, to submit an expert report where an expert is making statements about factual issues without a declaration from a fact witness, and to decide merely because one element of the many elements that are necessary to show secondary meaning. The courts weigh those factors and elements, and in many instances, they've granted summary judgment below, where there have been less than one element that might possibly support finding of secondary meaning. You've got a number of factors here, and I'd like to walk. The other thing the judge ruled is there was an inconsistent manner of use here. They were selling boards that were different sizes. They were selling brown-stained boards that were not even similar to the color, which they claimed constituted their trade rest. So I guess the question for the court is, do you simply rely on one factor out of half a dozen factors to conclude that this case should have gone to trial? And when a survey was prepared, it's a survey. He says that there's a five-year rule. He is not reading the Converse decision correctly. Converse said that the length of use is measured before the infringement, not after it. You don't look to what happened five years later. Otherwise, you can obviously build a much stronger record that there were increased sales five years after there was more advertising. Converse said the five-year rule applies to what was done before, that that's the most relevant period. So to say that you're allowed to take a survey that doesn't, by their experts' own admission, show the state of affairs at the time of the first use or sale by the alleged infringer is not an appropriate reading of the law. The law is very clear in Converse and by other courts, including by this court, that the secondary meaning has to arise at the time of the first infringing use. You have no survey evidence to support that. You have no consumer surveys to show what consumers might have perceived. In fact, you have no declaration from them. The size of the chips here was never tied to any particular individual. It was never shown that anybody was even seeking to buy different sized chips to use with our board game. It's just based on mere speculation. I know I'm running out of time, so I'd like to turn to the issue of confusion as well, which is also an independent requirement. There is no actual confusion in this record. All they did, the law, was to say, well, the owner of P&P was confused. And as this court knows, that's not sufficient evidence to show there's actual confusion. He's clearly a biased witness who's making a statement that he cannot support or that isn't tied to the pro-redundant. The other thing is in terms of potential confusion, which could still theoretically be shown, the only thing they ever pointed to was their financial data. Saying, well, our financial data shows that there's potential confusion. When I deposed their owner and a 36 witness, I specifically asked him, how does that show potential confusion? Simply because of sales information or financial data. He said, I have no idea. But didn't their expert provide a survey evidence in purporting to show confusion among consumers? I mean, again, at the summary judgment stage, that seems to raise a factual dispute. Well, again, but the confusion that he said existed, first of all, do you have the right to testify during fact discovery and never raise this issue and do it for the first time in expert discovery? If I had some testimony on the subject, couldn't I have questioned the witness and a 36 witness to testify on that particular subject? There was never – I asked the question, where's the confusion? And the witness could provide none. He said, well, I was confused. He said, well, our financial data showed it. There was no reference even to expert discovery. But, I mean, I'm not sure what evidence you expect the company executive to provide in that confusion. I mean, that's kind of the role of the experts to do survey evidence. I don't think we give much weight, you know, self-serving testimony from a party saying there's confusion. I think that's why we rely on experts on issues like this and survey evidence. And you can critique them and, you know, maybe struck down at the dauber stage or maybe the jury doesn't find it convincing. But it just seems like at this stage there is evidence in the form of surveys. Again, the survey was, by its own admission, by the expert's own admission, weighed consumer perception two and a half years after our alleged infringement. You can't – the five-year rule does not apply. It applies to what occurred before, not after. And the consumer surveys don't show anything about the state of affairs at the time – regarding confusion or secondary meaning at the time of the alleged first infringing use. The other question to ask yourself is why should a party be allowed to sit on its rights? There's no cease and desist letter here. They knew of our infringing use, our alleged infringing use, a year and a half before they filed a lawsuit. They then waited a year and a half while we continued to sell our product. We're doing nothing, never sending us a letter. And then they waited another year, so two and a half years later. And the question for the court under those circumstances is do you really want to encourage people to do nothing and then show up with a survey report when there's no evidence in the record by fact discovery or that's ever been offered? And simply because an expert shows up two and a half years later, a party can simply sit on its rights and do nothing for two and a half years and then all of a sudden show up and say, oh, we have a bunch of surveys that by the expert's own admission don't judge anything at the time of the first infringing use. And you're thereby incentivizing people to do nothing. Great. Thank you. I think you've exceeded your time unless my colleagues have any additional questions. Great. Thank you. Mr. Mahal. Thank you. I'd like to take through a few quick points. Number one, they don't defend the basis of the ruling below at all. Number two, this is obviously not functional dress because for 40 years no game used this dress and they all function the same way. And still all the other products have different dress and they all function the same way. Number three, unintentional copying. Our expert opined having reviewed all the evidence that based on my experience in the industry and given the admission of copying and identical design, Johnson acted with the purposeful intent to leverage PMP's brand identity. That precludes summary judgment. My friend says we had no evidence of actual copying. There are 30B6 witness admitted to actual copying. I don't understand that argument at all. Next, he argues that we didn't put in declarations from fact witnesses, but the law is crystal clear. Fed Deposit Insurance Corporation, for example, that the non-moving party need not introduce evidence in the form that would be admissible at trial to avoid summary judgment. The question is could we put it on? Obviously, we will call our CEO at trial if necessary. We'll call their CEO at trial. We are going to call fact witnesses at trial, but at summary judgment, you are allowed to present the evidence this way. They rely primarily on converse. Converse is not from this court. It's from another circuit. It's flagged in McCarthy as an aberrational standard. We satisfy the converse standard, but it's not the standard in this circuit. In this circuit, post hoc surveys are admissible. As cliques holds, these arguments go to weight. Those are jury arguments. Finally, on confusion, there are 30 pages in the Wallace Report explaining why there is confusion here. They spent two pages of their MSJ below on it. This was not their argument below, and the confusion evidence is overwhelming. Identical products, identical channels of distribution, survey data, deliberate copying. All of those factors this court has held are sufficient to get you to a trial individually, and we have all of them here. Respectfully, we clearly should be allowed to put on our trial. They have arguments that they can make to the jury. We think we will prevail, but the jury, not the court, at summary judgment is the place for those to be resolved. Thank you, Your Honor. Thank you both for the helpful argument. The case has been submitted. Also submitted are Escobar v. Garland, Yu v. Garland, Lim v. Garland, and Zinova v. Garland. We are adjourned for the day.
judges: TASHIMA, LEE, Cardone